CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED
APR 11 2006
JOHN F. CORCORAN, CLERK
BY:
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | |
|---|---|
| BONDCOTE CORP., ) | |
| ) | |
| Plaintiff, ) | Case No. 7:05CV00705 |
| ) | |
| v. ) | |
| ) | **MEMORANDUM OPINION** |
| KEITH AYERS, ) | |
| ) | By: James C. Turk |
| Defendant. ) | Senior United States District Judge |

The plaintiff, Bondcote Corp. ("Bondcote"), filed this civil action against the defendant, Keith Ayers, for breach of contract and other state-law claims related to a settlement agreement entered into by both parties. The case is before the court on the motion for summary judgment moved for by the plaintiff. The parties have filed supporting briefs and the court heard oral arguments on March 16, 2005. On request by the court, the parties also filed supplemental briefs on the issue of contracts against public policy. For the following reasons, the plaintiff's motion for summary judgment on the breach of contract and declaratory judgment claims is **Granted**. Pursuant to the plaintiff's oral motion, its remaining claims are **Dismissed**.

I.

On January 21, 2003, Ayers filed as a relator, a *qui tam* action against Bondcote in the Southern District of Georgia. Ayers claimed that Bondcote violated the False Claims Act by supplying tents, tarps, and vehicle coverings to the federal government which contained contractually prohibited toxins and by failing to disclose the presence of such toxins. Ayers was privy to the information that formed the basis of the suit because he supplied Bondcote with

1

pigments used in the manufacture of the non-conforming products. On February 13, 2004, the federal government intervened in the action.

Prior to the federal government's intervention, it tested the Bondcote products at issue to determine whether they were toxic. Testing revealed the presence of lead-based pigments in the manufacturing process but the conclusion was reached that the products were safe for their intended use. As a result, the government did not recall the Bondcote products and continue to use the products already purchased. Subsequently, Bondcote reached a settlement with the federal government that disposed of all the claims.

Ayers objected to the terms of the settlement but the district court approved the settlement over his objections. He then filed an appeal with the Eleventh Circuit Court of Appeals. In addition, Ayers and Bondcote were in dispute as to whether Ayers was entitled to attorney's fees, and if so, the award amount. While Ayers's appeal of the district court judgment was pending, he reached a settlement with Bondcote on the issue of attorney's fees on December 30, 2004. The settlement agreement ("Agreement") stated that Bondcote would pay Ayers a certain sum for attorney's fees and release its alleged claim of $10,000 against him in an unrelated matter concerning a purchase agreement, in return for Ayers's release of any further claims for attorney's fees. One of terms of the settlement agreement stated that Ayers was not to "directly or indirectly, solicit, contact, communicate with, stalk or harass [employees and customers of Bondcote], and that he [would] not cause another to do the same." See Complaint, Exhibit A, December 30, 2004 Settlement Agreement at 9. A stipulation of dismissal with prejudice was entered into by both parties. See Plaintiff's Motion for Summary Judgment, Exhibit 1, Stipulation of Dismissal with Prejudice.

2

Subsequently, on November 10, 2005, Ayers visited the president of Bondcote and told him that he intended to pass out flyers to Bondcote employees that stated that Bondcote's products contain hazardous materials and pose a risk to the employees and the public. On November 11, 2005, Ayers distributed the aforementioned flyers to Bondcote employees. In addition, on November 14, 2005, Ayers contacted Camel Manufacturing, a Bondcote customer, stating that he intended to distribute the flyers at Camel's place of business. See Plaintiff's Motion for Preliminary Injunction, Exhibit A, Defendant's Letter to Camel Manufacturing dated November 14, 2005. Bondcote notified Ayers that he was in violation of the settlement agreement, to no avail.

Bondcote brought this action for damages and an injunction to prohibit Ayers from violating the non-contact and non-disclosure provisions of the settlement agreement. Bondcote states that the settlement agreement is clear that Ayers cannot contact the media and Bondcote employees and customers, and the agreement is valid and enforceable. Ayers argues that the settlement agreement is unenforceable because there was no consideration and it is illegal in purpose.[1]

## II.

Upon motion for summary judgment, the Court must view the facts, and inferences to be drawn from those facts, in the light most favorable to the non-moving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-88, 106 S. Ct. 1348, 89 L. Ed. 2d (1986); Nguyen v. CNA Corp., 44 F.3d 234, 236-37 (4th Cir. 1995). Summary judgment is proper where

---

[1] The defendant has abandoned any affirmative defense premised upon the First Amendment.

3

there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c). The mere existence, however, of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).

When a motion for summary judgment is made and properly supported by affidavits, depositions, or answers to interrogatories, the non-moving party may not rest on the mere allegations or denials of the pleadings. FED. R. CIV. P. 56(e). Instead, the non-moving party must respond by affidavits or otherwise present specific facts showing that there is a genuine issue of disputed fact for trial. Id. If the non-moving party fails to show a genuine issue of fact, summary judgment, if appropriate, may be entered against the non-moving party. See Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).

### A.

The first issue is whether there is a genuine issue as to the validity and enforceability of the settlement agreement. Neither party disputes the rights and obligations of each party under the settlement agreement and Ayers does not dispute the fact that he signed the agreement knowingly and while fully understanding its terms. Ayers's first contention as to the validity of the Agreement is that there was no consideration given by Bondcote to Ayers. He states that he received none of the attorney's fees paid under the Agreement and, thus, he received no consideration for the rights that he relinquished. The Agreement was entered into under Virginia law and will be analyzed under the contract law of Virginia.

One of the fundamental prerequisites of a properly-formed contract is the exchange of

4

consideration. Consideration takes many forms and can validly exist as a promise to do an act or promise to refrain from doing an act. See Pierce v. Plogger, 223 Va. 116, 121, 286 S.E.2d 207 (1982) ("It may be in the form of a benefit to the party promising or a detriment to the party to whom the promise is made."). Here, one form of consideration that Ayers received from Bondcote was the attorney's fees that were in dispute. Ayers is correct that as a "successful" relator in the *qui tam* action, that he was entitled to be awarded reasonable attorney's fees and costs. See 31 U.S.C. § 3730(d). What amount was a "reasonable" award, however, was in dispute because Bondcote challenged Ayers's motion for attorney's fees.[2]

The district court would have held a hearing to determine a reasonable award for attorney's fees. The settlement agreement nullified a need for the hearing and settled the attorney's fees matter. Thus, Ayers received consideration because the Agreement settled a disputed fee amount efficiently and without need for further costs being incurred by Ayers in determining the fee award by evidentiary hearing.

Ayers's argument that he did not receive consideration because the entire fee award under the Agreement went to his attorneys is unconvincing. Whether Ayers assigned his fee award to his attorneys does not eviscerate the fact that only Ayers could move for attorney's fees to be awarded. See Evans v. Jeff D., 475 U.S. 717, 730-32, 106 S. Ct. 1531, 89 L. Ed. 2d 747 (1986) (stating that the general proposition is that federal fee-shifting statutes confer fee awards upon parties, not attorneys). But see United States ex rel. Virani v. Jerry M. Lewis Truck Part &

---

[2]Although Bondcote states that it does not believe that Ayers was entitled to attorney's fees, it is likely that he would have been awarded attorney's fees because Bondcote essentially admitted liability in the *qui tam* action. The genuine dispute that existed was the amount of fees to be awarded.

5

Equip. Co., 89 F.3d 574, 577 (9th Cir. 1996) (holding that the relator has the power to move for attorneys' fees, but the relator's attorneys are entitled to the fee). The plain language of 31 U.S.C. § 3730(d) states that attorney's fees are bestowed upon the relator, not his attorney. Thus, Ayers did receive consideration because he received the fee award. Whether he had to give the award proceeds to his attorneys under a separate agreement he entered into is irrelevant.[3]

Furthermore, Ayers received consideration under the Agreement not only for settlement of the attorney's fees award, but also because Bondcote agreed to release any claim against him for the dispute concerning the purchase agreement. See Pierce, 223 Va. at 121 ("The law is well settled that forbearance . . . to prosecute a well-founded or doubtful claim is a sufficient consideration for a contract."). Neither party disputes the fact that Bondcote could have proceeded against Ayers on this claim. Whether or not the claim would have succeeded is irrelevant because the consideration given in the release of that claim is the extinguishment of the possibility of a judgment against him and the time and expense Ayers might have incurred in having to defend against such a claim.

Since there was consideration for the Agreement, the contract is not invalidated for lack thereof. If a non-ambiguous contract that was validly entered into exists, the parties are obligated to live by its terms and a court will enforce a contract against breaching parties. An exception to the rule, however, exists for contracts against public policy.

---

[3]Ayers's assertion that he assigned the fee award to his attorneys also contradicts the provision in the Agreement that he knowingly signed, that states "The parties also are mindful of case law which stands for the proposition that **only Relator has the right**, regardless of assignment to his counsel or other third party, to pursue a claim for attorneys' fees . . . With the foregoing in mind, **Realtor hereby represents and warrants that he has not assigned any other claim** . . . and that he has full authority to completely release the Released Group . . . ." See Complaint, Exhibit A, December 30, 2004 Settlement Agreement at 8 (emphases added).

6

**B.**

Ayers argues that even if the Agreement was validly entered into, it cannot be enforced because it is against public policy. Specifically, he argues that the Agreement provisions that prohibit him from contacting Bondcote employees or customers that have been possibly exposed to toxins such as lead chromate cannot be enforced because it would be against public policy to deter a person from exposing public health and safety hazards. "Under the principles relating to the doctrine of public policy, as applied to the law of contracts, courts of justice will never recognize or uphold any transaction which, in its object, operation or tendency, is calculated to be prejudicial to the public welfare." See O'Dell v. Appalachian Hotel Corp., 153 Va. 283, 292, 149 S.E. 487 (1929). Therefore, a contract against public policy is void and not susceptible of enforcement. See Wallihan v. Hughes, 196 Va. 117, 124, 82 S.E.2d 553 (1954)

The more complex question is determining whether a contract is void because it is against public policy. "Public policy has its place in the law of contracts, yet that will-o'-wisp of the law varies and changes with the interests, habits, need, sentiments, and fashions of the day." See id., 196 Va. at 125. Courts are averse to holding contracts against public policy unless their illegality is clear and certain. Id. The meaning of the phrase "public policy" is vague and variable but whatever "tends to injustice or oppression . . . or to the violation of a statute" is against public policy. See id. at 124. The courts have also approved of the definition of public policy as the principle "which declares that no one can lawfully do that which has a tendency to be injurious to the public welfare." Id. With this definition of public policy in mind, the Agreement is not against public policy because it is not injurious to the public welfare when balancing competing interests.

7

No Virginia statute or case law exists that explicitly prohibits the contract that Ayers and Bondcote have made.[4] The court, however, assumes without holding so, that a contract that prohibits a person from revealing a yet undisclosed hazard to the public health or safety would be against public policy. No party can or should be able to use a contractual non-disclosure or non-contact provision to shield itself from liability for revelations injurious to the public health or safety. The settlement agreement, however, between Ayers and Bondcote is not against public policy because: (1) The alleged health or safety hazard Ayers seeks to expose has not been deemed as such except by Ayers; and (2) The alleged health or safety hazard that Ayers seeks to expose is already known in the public domain.

Ayers contends that the health threat at issue is the use of lead chromate in Bondcote's products. Chronic exposure to lead chromate has been found to be carcinogenic or cause other health problems. See International Labour Organization Data Sheet - Lead Chromate, *available at* http://www.ilo.org/public/english/protection/safework/cis/products/icsc/dtasht/_icsc00/icsc0003.htm. Bondcote admitted during the prosecution of the *qui tam* action that lead chromate is used on certain products. The federal government, however, conducted an investigation into Bondcote's products and "concluded that the material is safe for its intended use." See Plaintiff's Motion for Summary Judgment, Exhibit 2, August 20, 2004 Order in *qui tam* action, U.S. ex rel. Ayers v. Bondcote Corp, et al., at 3-4. In addition, no federal or state

---

[4] Ayers contends that Bondcote is violating federal and/or state regulations by not properly notifying employees of the use of certain chemical compounds in the workplace. The proper solution is to notify the appropriate government agencies, rather than violating the settlement agreement. Cf. Assassination Archives & Research Center v. C.I.A., 48 F. Supp. 2d 1, 15 (D.D.C. 1999) ("Seen in the light most favorable to the plaintiff, [plaintiff's] violations of the confidentiality agreement were acts of improper 'self-help' which should be discouraged by the courts in favor of appropriate avenues for reporting concerns of misconduct.").

8

agency has found any health risk or hazard in the use or manufacture of Bondcote's products. Although the court realizes that private citizens provide a valuable service by alerting the public about a possible danger that undermanned government agencies may sometimes miss recognizing, it cannot countenance deeming something a health hazard just because one lay person alleges so.[5] Ayers has not offered into evidence any scientific or medical proof that Bondcote's products are hazardous other than his own opinion.[6] Ayers's bald, conclusory, and unsubstantiated allegation as to harm cannot prevent summary judgment. See Williams v. Food Giant, Inc., 370 F.3d 423, 433 (4th Cir. 2004) (stating that a party's mere self-serving opinion cannot, without objective corroboration, defeat summary judgment).

Ayers further contends that the public hazard that he is also trying to expose is Bondcote's continued use of lead chromate in the manufacturing process of its products. Again, the federal government tested Bondcote's products and deemed that they were safe. No federal or state agencies have uncovered any public health risk to Bondcote's employees or customers due to exposure to Bondcote's products or the manufacture thereof. Ayers has not offered any evidence that Bondcote's manufacturing process is a health hazard other than his lay conclusion derived from unidentified "soot" deposits stemming from smoke plumes from the Bondcote factory. See Defendant's Answer at 9.

---

[5]Even Erin Brockovich had to find a "smoking gun" before her accusations became viable.

[6]The defendant refers to a statement of a government health official on the government's search warrant dated April 30, 2003, see Defendant's Answer, Exhibit B, Government's Search Warrant for Bondcote at 2, as to the possible toxicity of Bondcote's products. The statement creates no genuine issue because the government's subsequent detailed testing refuted this initial conjecture.

9

In addition, Ayers is not exposing or revealing the use of lead chromate by Bondcote because it is already public knowledge. Lead chromate use was the basis of the *qui tam* action against Bondcote. During the pendency of the *qui tam* action, there was prevalent media exposure as to the allegations. Upon settlement of the *qui tam* action between Bondcote and the federal government, the public was informed of Bondcote's misdeeds through the government and media. See Complaint, Exhibit B, United States Attorney's Office for the Western District of Virginia News Release dated May 14, 2004; Plaintiff's Supplemental Brief in Support of Motion for Summary Judgment, Exhibit A, Various Newspaper and Internet Articles. Bondcote's conduct was so disdainful that politicians such as Senator Chuck Grassley (R-IA) made public comments chastising the plaintiff. To state that Bondcote's use of lead chromate is not publicly known is unconvincing. Therefore, Ayers's assertion is incorrect that people that have somehow previously come into contact with Bondcote's products would not be informed of Bondcote's use of lead chromate unless he is able to communicate with them; the prior and current media coverage has documented Bondcote's use of lead chromate.

In addition, Ayers's claim of harm to people who live around Bondcote's factory further exposes the fallacy in his argument that he is the only person that can expose Bondcote's alleged ongoing misconduct. The media has written about the "mysterious soot" flowing from Bondcote's factory and people have already have complained to state authorities. See Defendant's Supplement Brief in Opposition to Plaintiff's Motion for Summary Judgment, Exhibit F, Roanoke Times Article. It would not be against public policy to enforce Ayers's decision to contract away his right to speak of Bondcote's use of lead chromate because Bondcote's products have not been found to be a health hazard, Ayers is not the only source of

10

information regarding Bondcote's use of lead chromate, and such information is already known to the public.

"The law favors compromise and settlement of disputed claims." See Snyder-Falkinham v. Stockburger, 249 Va. 376, 381, 457 S.E.2d 36 (1995) (citation omitted). Confidentiality provisions are often instrumental in effectuating that purpose. Balancing this competing interest with the fact that Ayers's accusations of public safety dangers are unfounded and Bondcote's use of lead chromate has already been exposed by the media, it would not be against public policy to enforce a settlement agreement that required a person to contract away his right to contact certain persons or to disclose facts already known to the general public.

If Ayers is truly concerned about the health hazards at Bondcote, he still has an avenue to be a public crusader.[7] Although Ayers may not be able to contact Bondcote employees or customers directly, the Agreement does not prohibit him from contacting state or federal agencies to notify them of the possible health concerns or Bondcote's alleged failure to meet workplace safety regulations. First, the Agreement only prohibits Ayers from contacting, *inter alia*, Bondcote employees or customers directly. Second, the Agreement only prohibits Ayers from discussing facts related to the previous *qui tam* action; any new violations by Bondcote can and

---

[7]The court wishes to believe that Ayers's attempt to portray himself as a white knight is genuine. See, e.g., Plaintiff's Motion for Summary Judgment, Exhibit 8, Letter from Keith Ayers dated January 22, 2006 ("I am unconcerned about my future as long as I do what is right."). His conduct during the pendency of this litigation, however, reveals a man more akin to bitter Shylock thirsting for his pound of flesh. See Plaintiff's Motion to Show Cause, Exhibits B-E, Correspondence Discussing Settlement (stating that the defendant proposes to settle this dispute if the plaintiff "loans" the defendant money and resumes business relations). The Court finds it peculiar that the defendant would propose to resume business relations with a party that he finds so contemptible and without any guarantee from the plaintiff that it would cease its alleged misconduct.

11

should be reported to the proper authorities.

## C.

The plaintiff also moves for summary judgment on its declaratory judgment cause of action. The declaratory judgment claim is based on whether Ayers must abide by the obligations under the Agreement. The court can exercise jurisdiction over the declaratory judgment claim because it has diversity jurisdiction over the parties, there is an actual and justiciable controversy because Ayers has violated the Agreement and has stated that he intends to do so in the future, and there is no abuse of discretion in exercise of jurisdiction. See Volvo Constr. Equip. of North America, Inc. v. CLM Equip. Co., 386 F.3d 581, 592 (4th Cir. 2004) (stating the prerequisites for a district court to exercise jurisdiction in a declaratory judgment action). The court has found that there is no genuine issue as to the Agreement's validity and enforceablility and the terms of the Agreement are clear, specific, and unambiguous. Therefore, no genuine issue exists as to the declaratory judgment claim; the plaintiff is entitled to summary judgment that the defendant cannot violate the terms of the agreement, including the provisions that prohibit the defendant from contacting the plaintiff's employees and customers. Furthermore, the plaintiff must abide by the Agreement that he cannot contact the media or encourage others to file suit against the plaintiff concerning facts related to the *qui tam* action.

Bondcote is entitled to injunctive relief against Ayers and, therefore, Bondcote's remaining claims are dismissed pursuant to its oral motion.

Case 7:05-cv-00705-JCT Document 51 Filed 04/11/06 Page 12 of 13 Pageid#: 507

## III.

Summary judgment is granted in favor of the plaintiff on the breach of contract and declaratory judgment claims because there is no genuine issue in dispute as to the following:

(1) The plaintiff and defendant validly entered into the settlement agreement which is enforceable against either party.

(2) The defendant has violated provisions 8 and 9 of the settlement agreement by contacting the media and the employees and customers of Bondcote, and intends do to so in the future.

ENTER: This 11th day of April, 2006.

James C. Turk
Senior United States District Judge

13